UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| THELMA WHITE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case no. 4:12-cv-00469 JAR |
| | ) | |
| v. | ) | |
| | ) | |
| 14051 MANCHESTER, INC., d/b/a | ) | |
| HOTSHOTS SPORTS BAR & GRILL, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM IN SUPPORT OF
MOTION TO DECERTIFY COLLECTIVE CLASS

Defendants 14051 Manchester, Inc., d/b/a HotShots Sports Bar & Grill, 12154 Rock

Road, Inc., d/b/a HotShots Sports Bar & Grill, 950-952 South Highway, LLC d/b/a HotShots

Sports Bar & Grill, 12644 Dorsett Road, LLC, d/b/a HotShots Sports Bar & Grill, 215 O'Fallon

Place, LLC, d/b/a HotShots Sports Bar & Grill, 4021 Union, LLC, d/b/a HotShots Sports Bar &

Grill, 1636 County Club Plaza, Inc., d/b/a HotShots Sports Bar & Grill, 730 HSBG, LLC, d/b/a

HotShots Sports Bar & Grill, 1319 Central Park, LLC, d/b/a HotShots Sports Bar & Grill, 3333

Ridgeway, Inc., d/b/a Hotshots Sports Bar & Grill, Daniel Volmert and Julie Volmert

(collectively, "Defendants" or "Hotshots"), for their Memorandum in Support of Their Motion to

Decertify Collective Class pursuant to Local Rule 7-4.01(A), state as follows:

## I.      Introduction

The members of the collective, opt-in class ("Plaintiffs") are not entitled to collective

class certification because they have admitted that they are not victims of a common decision,

policy, or plan that violated the law.  Plaintiffs bear the burden of establishing that they are

similarly situated with evidence of an unlawful company-wide policy that affected all Plaintiffs

uniformly.  *Wacker v. Personal Touch Home Care, Inc.*, 2008 WL 4838146, at *4 (E.D.Mo. Nov. 6, 2008).

Hotshots' written policy on tip sharing is lawful.  It states that tip sharing is voluntary. This is the Hotshots tip sharing policy, and at least one Plaintiff has admitted that voluntary tip sharing is the policy.  The only consistent, uncontradicted evidence of a **uniform, company-wide** policy concerning tip sharing in this case is that Hotshots' lawful policy states that tip sharing is voluntary.

Plaintiffs, in contrast, have alleged a uniform tip sharing policy that is not lawful because it is not voluntary and requires sharing tips with cooks and dishwashers.  Before any allegations were tested through the discovery process, Plaintiffs alleged that Defendants required all of the tipped employees to share tips with cooks and dishwashers.  *Fourth Amended Complaint, Doc #100*, at ¶1, 56.  The Named Plaintiffs alleged that they, and each and every server and bartender at each and every Hotshots location, were required to follow the same policy to which they were subject.  *Motion for Conditional Class Certification, Doc. #44*, at p.4-5; *White Declaration, Doc. #44-2*, at ¶14-16; *Carroll Declaration, Doc. #44-3*, at ¶15-17.  The Named Plaintiffs testified by affidavit that the tip pooling policy to which they were subject "applies uniformly to all of the Hotshots locations."  *White Declaration, Doc. #44-2*, at ¶14; *Carroll Declaration, Doc. #44-3*, at ¶15.  They also attested that all other Hotshots servers and bartenders were required to follow the same policy.  *White Declaration, Doc. #44-2*, at ¶14 ("[o]ther Hot Shots' servers and bartenders were required to follow this exact same tip pooling policy"); *Carroll Declaration, Doc. #44-3*, at ¶15.

Unfortunately for Plaintiffs, discovery has revealed, conclusively, that there is no unlawful, company-wide policy with respect to tip sharing.  In contrast to Plaintiffs' mere

2

allegations, all evidence concerning a contrary, unlawful policy demonstrates that Plaintiffs cannot establish a uniform company-wide policy.  This evidence includes, but is by no means limited to, Plaintiffs' own admissions.  Therefore, the class must be decertified.  This case is no longer in the pleading stage nor do Plaintiffs face the modest standard for conditional certification.  Now that Plaintiffs' allegations have been tested, the evidence reveals:

- Several Plaintiffs, including the Named Plaintifs, admitted that they are not required to share their tips on each shift they work.  This directly contradicts Plaintiffs' allegations, required for class certification, that all servers were required to share tips on every shift.

- Plaintiffs stated that they were subject to many different policies, ranging from sharing 2% of their tips with cooks to 15% of their total sales.  Some of these Plaintiffs worked under the same manager at the same location but contradicted each other as to what the policy was.

- Plaintiffs have repeatedly admitted that they have no knowledge of the policies at Defendants' locations where they did not work.  Therefore, the Named Plaintiffs admit they were not telling the truth when they filed declarations in support of conditional certification that said that an unlawful policy "applies uniformly to all of the Hotshots locations."

The policies to which the Plaintiffs were subject do not follow any pattern as to location or supervisor; there is no single policy at any Hotshots location or administered by any manager. Therefore, the conditional class should be decertified.

Plaintiffs' testimony admits that there is no uniform policy applied to all Plaintiffs. Therefore, a collective trial on Plaintiffs' claims is not possible because of the individualized

issues and defenses that must be examined.  One individualized issue will be Plaintiffs'

credibility.  *See Martin v. Citizens Fin. Group*, 2013 WL 1234081, at *6 (E.D.Pa. March 27,

2013) (plaintiffs' contradictory testimony and credibility issues compel decertification to prevent

wide-ranging trial).  Nicole Carroll and Thelma White ("Named Plaintiffs"), whose signed

declarations provided the only factual basis for conditional class certification, testified upon

examination that they repeatedly lied in those declarations, particularly regarding whether they

were similarly situated to their co-workers.  Other Plaintiffs also lied or admitted to lies in their

depositions, including misreporting their tips to Hotshots.  These credibility issues cast doubt on

Plaintiffs' individual claims.   For the purposes of this Motion, however, the important point is

that Defendants are not required to take issue with the credibility of individual Plaintiffs within

the context of a class action.  Rather, where such individualized issues arise, the conditional class

should be decertified.

## II.    Plaintiffs have the burden to show that they are similarly situated to each other.

Class actions under the FLSA, also known as "collective actions," are authorized by

statute.  "An action to recover the liability prescribed in either of the preceding sentences may be

maintained against any employer . . . in any Federal or State court of competent jurisdiction by

any one or more employees for and on behalf of himself or themselves and other employees

similarly situated."  29 U.S.C. § 216(b).  While the Eighth Circuit has not chosen a standard to

determine whether putative plaintiffs are "similarly situated" under 29 U.S.C. § 216(b), the

Eastern District has adopted the two-step procedure used by many district courts "where

plaintiffs first seek early conditional certification, and then later the court considers the merits,

including whether plaintiffs have shown that the class comprises similarly situated employees."

*Jost v. Commonwealth Land Title Ins. Co.*, 2009 WL 211943 at *2 (E.D.Mo. Jan. 27, 2009)

(citing procedure's use by other district courts in the Eighth Circuit).  Plaintiffs were granted conditional class certification on November 30, 2012, based on the affidavits supplied by the Named Plaintiffs.  *Doc. #68*.  After modification, the Court conditionally certified a class of "all current and former hourly-paid employees of Hotshots who shared in any tip pool for the period of three (3) years from the date of mailing notice."  *Doc. #76*.

In the second stage of the certification process, usually prompted by a motion to decertify, the Court makes a final certification determination.  *Martin v. Citizens Fin. Group*, 2013 WL 1234081, at *2 (E.D.Pa. March 27, 2013) (analyzing two-step procedure also adopted in the Eastern District of Missouri).  In this second stage, the Court applies a "stricter standard and more closely examine[s] the question of whether particular members of the class are, in fact, similarly situated."  *White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012) (affirming decertification).  The burden on a motion to decertify is on the plaintiffs "'to establish that they satisfy the similarly situated requirement'[.]"  *Martin*, 2013 WL 1234081, at *2 (quoting *Zavala v .Wal-Mart Stores, Inc.*, 691 F.3d 527, 537 (3d Cir. 2012)).  The court's analysis in the second stage involves a fact intensive inquiry of several factors, including: (1) the extent and consequence of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural concerns.  *West v. Border Foods, Inc.*, 2006 WL 1892527, at *3 (D.Minn. July 10, 2006) (denying motion for conditional certification).

### III.    Hotshots' lawful tip sharing policy precludes collective certification.

Any amount that any Hotshots employee shared with another employee was completely voluntary and therefore lawful under the FLSA.  An employer is not required to pay a full minimum wage to tipped employees if the employer pays the tipped employee one half of

minimum wage and her tips account for the difference between that amount and the minimum

wage at the time.  29 U.S.C. § 203(m).  This is called a tip credit.  In some situations, tips from

tipped employees are shared with other employees.  This is called a tip share or tip pool.  The tip

credit may only be taken where the recipients of money from a mandatory tip pool are "tipped

employees," defined as "any employee engaged in an occupation in which he customarily and

regularly receives more than $30 per month in tips."  29 U.S.C. § 203(t); 29 CFR § 531.54.

Where a tip pool is voluntary, the employer may maintain the tip credit (i.e., the tip pool is valid)

even if the tips are shared with ineligible employees.  *See, e.g.*, 29 CFR § 531.54 ("Similarly,

where an accounting is made to an employer for his information only or in furtherance of a

pooling arrangement whereby the employer redistributes the tips to the employees upon some

basis to which they have *mutually agreed among themselves,* the amounts received and retained

by each individual as his own are counted as his tips."); *Turner v. Millenium Park Jt. Venture,*

*LLC*, 767 F. Supp. 2d 951 (N.D.Ill. 2011) (granting summary judgment to employer where the

Court found an "implied" agreement between employees to share tips with otherwise ineligible

employees).

     Hotshots has a lawful written policy concerning tip sharing.  The Hotshots Employee

Handbook states:

> It is suggested a **voluntary** 5% gratuity to the cooks and bartenders at the end of
> your full shift.

Employee Handbook at HOTSHOTS00194, attached hereto as Exhibit A (emphasis added)

(deposition Exhibit 12).  Defendant Julie Volmert testified that Hotshots does not require or

advocate tip pooling, and that if employees want to do it, it is strictly voluntary.  *Julie Volmert*

*Deposition* at 192:17-22, relevant portions of which are attached hereto as Exhibit B.  This

written policy is consistent with the FLSA and its interpretations allowing lawful, voluntary tip

6

sharing between employees who agree to give and receive tips.  *See* 29 CFR § 531.54; *Turner*, 767 F. Supp. 2d 951.

In *Richardson v. Wells Fargo Bank, N.A.*, 2012 WL 334038, at *4 (S.D.Tex. Feb. 2, 2012), the employer had "a written policy that requires employees to accurately report all hours worked."  The Court held that "written policies are relevant considerations when assessing workers' arguments about the existence of a company-wide policy."  *Id.*  Some employees testified that it was "understood" that employees had to work off-the-clock, or that certain managers expressly told them to do so.  *Id.*  The Court found it "clear that resolution of each Plaintiff's claim will require individualized inquiries about his or her specific managers' policies and practices."  *Id.* (denying conditional certification).

All Hotshots employees testifying in the attached affidavits, including servers, bartenders, cooks, and managers, have uniformly stated that, consistent with the written policy, there was no requirement for servers and bartenders to share tips with any other employee.  *See Exhibits* C through AE (Affidavits in alphabetical order by last name).  At least one Plaintiff agrees that the written policy is Hotshots' policy.  *Alicia Baum Deposition* at 23:18-25, relevant portions of which are attached hereto as Exhibit AF.  This is the only evidence of a uniform tip sharing policy.  That policy is lawful.  As described below, all other evidence is the Plaintiffs' disparate evidence of policies that are not consistent with each other.  Therefore, Plaintiffs are not entitled to collective certification because resolution of those claims will require individualized inquiries of their different policies.

IV.     **The individual Plaintiffs have alleged that they are subject to different tip sharing policies.**

Plaintiffs must prove that they are subject to a specific, uniform policy that affects all Plaintiffs in the same way.  *Martin*, 2013 WL 1234081, at *5 (E.D.Pa. March 27, 2013). Plaintiffs have not presented a specific, uniform, company-wide unlawful policy to prove that they are similarly situated.  Their testimony and statements show that each operated under a different policy.  Their evidence is of dozens of different policies, including not always being required to share their tips and wildly different amounts that they shared with different employees.  Hotshots has a lawful written policy, and evidence of practice or enforcement inconsistent with that lawful written policy will involve individualized inquiries that are not appropriate for collective certification.

a.  **Plaintiffs' claims are factually disparate because some Plaintiffs have testified that they were not required to share tips on all shifts, and were not punished or terminated for not doing so.**

Plaintiffs alleged that they (and all other Hotshots servers and bartenders) were subject to a uniform tip sharing policy that required them to share tips with other employees each and every shift that they worked.  *Motion for Conditional Class Certification, Doc. #44*, at p.4-5; *White Declaration, Doc. #44-2*, at ¶14-16; *Carroll Declaration, Doc. #44-3*, at ¶15-17.  Several Plaintiffs (including the Named Plaintiffs), however, have admitted that they were not required to share their tips on all shifts.  Plaintiff Baum testified that, at times, there would be an "agreement" between a server or bartender, on one hand, and a cook or doorman, on the other hand, to not give any tip to the cook or doorman.  *Baum Deposition* at 85:6-22; *see* 29 CFR § 531.54; *Turner*, 767 F. Supp. 2d 951 (a tip sharing agreement among employees is lawful).

8

Named Plaintiff Carroll testified that she did not have to tip $10 to cooks every shift that she worked, despite having stated in her Declaration and Interrogatory Answers that she did have to give that amount on every shift. *Carroll Deposition* at 180:13-17 ("Q. So, you didn't have to tip out $10 every night?  A. No, not every night[.]"), relevant portions of which are attached hereto as Exhibit AG.  Named Plaintiff White testified that if a manager, "Greg," was on duty in the kitchen, "you don't have to tip him out," and he did not require her to participate in tip pooling. *White Deposition* at 130:3-21, relevant portions of which are attached hereto as Exhibit AH. "Greg" usually worked seven days a week.  *White Deposition* at 194:20-195:19.  Plaintiff Baum also testified that, when a kitchen manager was on duty, she was not required to give any tips. *Baum Deposition* at 47:8-19 (kitchen manager worked all weekdays).  She did not know if other servers and bartenders were subject to the same policy.  *Id.* at 47:20-23.  Lisa Losito said the same. *Losito Deposition* at 20:23-21:2, relevant portions of which are attached hereto as Exhibit AI.  Bridget Dannan testified that, if an employee did not make much money, she was not required to tip anyone.  *Dannan Deposition* at 61:15-20, relevant portions of which are attached hereto as Exhibit AJ.  Ms. White also testified that there were circumstances where servers or bartenders did not tip cooks or doormen, and there was no punishment for not doing so.  *White Deposition* at 69:15-70:15.  Ms. Carroll testified that there was no discipline to servers or bartenders for not giving money to another employee.  *Carroll Deposition* at 200:25-201:8 (servers and bartenders not disciplined or fired).

Plaintiffs are not subject to a uniform policy when that policy is not followed at all times, by all Plaintiffs, and affects them in the same way.  In *Briggins v. Elwood Tri, Inc.*, 882 F. Supp. 2d 1256, 1268 (N.D.Ala. 2012), the Court found that evidence from some of the plaintiffs that they did not have to perform unpaid work on certain shifts was "[m]ost significant[]."  882 F.

Supp. 2d at 1268.  One plaintiff could not recall having to perform unpaid work when working in a certain area of the factory.  *Id.*  Others testified that, in certain areas, they only had to perform unpaid work "on isolated occasions."  *Id.* at 1268-69.  The Court found that "[o]ther courts have considered whether the plaintiffs' *claims* are factually disparate as a factor in granting a motion to decertify."  *Id.* at 1269 (emphasis in original).

In *Wright v. Pulaski County*, 2010 WL 3328015 (E.D.Ark. Aug. 24, 2010), employees alleged that they were not paid for all time worked, including before clocking in and during breaks.  The evidence showed that, because the employees worked on different shifts in different departments, there were "disparate factual and employment settings that affect whether a given plaintiff takes a full lunch break."  *Id.* at *9.  Some employees had to report thirty minutes early, some reported an hour early, and some "but not all" employees in one department did not have to report early at all.  *Id.* at *10.  "In sum, the record indicates that the plaintiffs' individual experiences regarding missed lunch breaks vary from shift to shift and day to day and that Plaintiffs are not similarly situated with respect to this claim."  *Id.* at *9 (granting motion to decertify).

Several Plaintiffs have admitted that tip sharing at Hotshots is not mandatory.  It is not mandatory because, as they testified, they were not required to participate, and there was no discipline if they did not participate.  Even the circumstances under which they allege that they were not required to participate are disparate: depending on who was in the kitchen, or whether the employee worked day or night, or if the employee met some undefined threshold whereby she simply did not have to share any tip.  Assessing the alleged requirement in a collective manner is not possible; individualized inquiries of the conditions of the requirement will be necessary.

### b.  Employees who have different experiences are not subject to a uniform unlawful tip sharing policy.

Plaintiffs have admitted being subject to disparate, individualized tip sharing policies. They have not uniformly stated when they were required to share tips, who required them to tips, or even whether they were required to share tips.  Where there are dissimilarities between different Plaintiffs' experiences as they relate to the allegedly unlawful policy, the Plaintiffs are not similarly situated and their claims are not subject to collective certification.  *See Johnson v. TGF Precision Haircutters, Inc.*, 2005 WL 1994286, at *2 (S.D.Tex. Aug. 17, 2005).  In *Johnson*, the Court found "substantial variance of experiences by different Plaintiffs under different managers and at different shops[.]"  *Id.*  The Court also relied on *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709 (E.D.La. July 2, 2004), which found that "the corporate 'policy' at issue in the case – one of keeping employee wage costs low – was not uniformly or systematically implemented at any given store."  *Johnson*, 2005 WL 1994286, at *2; *Basco*, 2004 WL 1497709, at *8 ("it is clear that even within a given store, one manager in one department would react to the 'policy' differently than in another department").

Plaintiffs here have testified to dozens of inconsistent policies, with different policies being practiced between stores, between managers, and even within the same stores and by the same managers.  First, Named Plaintiffs Carroll and White have testified that they were subject to different policies.  Carroll stated that she had to give at least $10.00 per night to each cook on weekdays, and $20.00 per night to each cook on weekends.  *Carroll Answers and Objections to Defendants' First Set of Interrogatories* at #6, attached hereto as Exhibit AK.  White stated that she had to give at least 5% of her total tips earned per night to "the cook."  *White Answers and Objections to Defendants' First Set of Interrogatories* at #6, attached hereto as Exhibit AL.

White and Carroll could not explain whether they were subject to the same tip sharing policy. *Thelma White Deposition* at 96:18-97:3 ("I'm not Nicole.  I'm Thelma.  I'm – I'm only answering my – for me.  I cannot answer for somebody else."); *Carroll Deposition* at 92:10-14 ("Q. Did you and Thelma White work under different tip pooling policies?  A. Not that I'm aware of.  I don't know what the server – I mean, I don't know.").

The amounts that different Plaintiffs were required to tip are an integral part of the policy to which each Plaintiff was subjected.  Deposed Plaintiffs testified that the Hotshots tip sharing policies to which they were subjected were defined by the amount or percentages that they were required to share with other employees.  *Baum Deposition* at 44:22-45:3 ("Q. When you told me that HotShots required five to ten percent of total sales to be given to the doorman, five to ten percent of total sales to be given to the bar, and five to ten percent to the cooks, is that what you believe HotShots' tip sharing policy was?  A. Yes."); *Losito Deposition* at 44:18-45:17 ("Q. And have you told me what you believe that the HotShots tip sharing policy to be?  [Objection.]  A. You mean like the percentages?  Q. Well, tell me what you believe that policy to be. [Objection.]  A. The policy was that you have to tip out the bartender, cook, and doorman the required – a minimum of the required amount." (continuing to explain the amounts)); *Carroll Deposition* at 59:8-16 ("Q. What in your opinion was the HotShots' tip pooling policy? [Objection.]  A. From my understanding, it was five percent of your tips or, as it was explained to me by the bartenders, it was, you know, a minimum of $10 a night and $20 on the weekends.").

General allegations of an unlawful policy are insufficient.  The Plaintiffs must be subject to a specific, unvarying policy that affects them uniformly.  *Martin*, 2013 WL 1234081, at \*3 (E.D.Pa. March 27, 2013).  The *Johnson* Court found that "[o]ne core question in the overall

analysis essentially is whether Plaintiffs are all complaining of the same practice or policy that gives rise to their claims."  2005 WL 1994286, at *3.  Plaintiffs contended that there was an "overarching policy to deny Plaintiffs overtime pay," evidenced by the employee manual and the owner's "tight supervisory control."  *Id.*  The manual instructed employees to arrive fifteen minutes early "so as to be prepared to work at your scheduled time," but did not state that the employees would not be compensated for that time.  *Id.*  Many employees and "a handful' of former managers and supervisors also filed declarations stating that employees were often required to work off the clock.  *Id.*  Several declarations stated that employees were required to clock out on breaks, "without identifying the reason, nature or length of the break."  *Id.*  Some stated that they were required to clock out while not engaged with a customer, or had time taken off their timesheets.  *Id.* at *4.  The owner admitted that, if a timesheet showed more than eight hours in a day, he would deduct 30 minutes for lunch.  *Id.*  Employees also complained of attending unpaid meetings, which the owner acknowledged.  *Id.*  These facts, however, did not compel collective certification.  *Id.*  While some employees may have had prima facie FLSA claims, the claims were at "different times, in different ways, and to different degrees," and "the evidence of varied particular violations is insufficient to show that Defendants implemented a uniform, systematically applied policy of wrongfully denying overtime pay to Plaintiffs." *Id.* While the employees alleged an overarching unlawful policy, "the alleged violations are not uniform; to the contrary, they are highly variable, evidently depending to a great extent upon circumstances and the attitudes and perception of individual managers[.]"  *Id.*  "The numerous variations of complaints alleged, and concomitant individual inquiries that would be required, all weigh in favor of decertification."  *Id.*

Plaintiffs are required to be subject to a detailed, uniform unlawful policy that was uniformly or systematically implemented in order to qualify as similarly situated and subject to collective certification. *Johnson*, 2005 WL 1994286, at \*2.  Plaintiffs have instead stated and testified that they were subject to dozens of different policies.

### i.  Plaintiffs testified about many different tip sharing policies.

Plaintiffs responded in a variety of ways about the Hotshots tip sharing policy.  The inconsistencies are more pronounced when the policies alleged by each opt-in Plaintiff are considered.  Each Plaintiff responded to Interrogatories and stated the policy to which she was subject.  Each Plaintiff also identified the location or locations where she worked, and the managers who required her to participate in the alleged tip-sharing scheme.  Plaintiffs' Interrogatory answers stating the policy to which they were subject (in response to Interrogatory #6) are assembled in alphabetical order and attached hereto as Exhibit AM.  Plaintiffs also answered an Interrogatory identifying the Hotshots locations where they worked (in response to Interrogatory #4).  *Id.*  Plaintiffs also identified the managers who required them to participate in tip sharing (in response to Interrogatory #8).

With respect to the requirement that servers and bartenders give tips to cooks, some, like Named Plaintiff White, stated that they were required to give a percentage of their *tips* to cooks.  Those who stated that they had to give a percentage of their *tips* did not consistently state an amount they were required to give.  Named Plaintiff White, like some others, stated that she had to give 5% of her tips to cooks.  *See Exhibits AH & AL* (Plaintiffs Bequette, Bradley, Brown, Evans, Femmer, Hufford, Kasal, Kline, Lambur, Olsen, Phinney, Erica Reno, Taylor Reno, Shockley, St. Pierre, Toole, White, and Zimmerman).  Others were required to give a larger percentage of their tips to the cooks: up to four times as much as the first group of Plaintiffs.  *See*

14

*Exhibit AM.* (Plaintiffs Alexander (5-10%), Campbell (5-10%), Grace (15-20%), Guastro (10-15%), Laenen (10%), Nagel (20%), Nenninger (10-15%), Price (5-10%), Rhodes (10%), Roskowske (10%), Runge (5-10%), Schuck (5-10%), Smith (10%), and Woolfrey (10-15% or more)).  Some Plaintiffs did not have to share five percent.  *See id.* (Akerboom (2-5%) and Kraml (3-8%)).  Plaintiff Miller stated that she had to share a percentage of all her tips, but she did not state an amount.  *See id.*  Plaintiff Nitz stated that she had to "share 5% of her tips with bartenders, cooks and doormen," although it is unclear whether she was required to share 5% *each* with those groups of employees, or 5% of her tips were distributed among those employees.  *See id.*

Many other Plaintiffs testified that they were required to give cooks an amount of money based on their sales, and even then not consistently: the percentages vary greatly, some had to give based on *total sales*, and some gave to the cooks based on *food sales* only.  Plaintiff Dannan, among others, stated that she had to give a percentage of her *food sales* to the cooks. *See Exhibit AM* (10% of food sales).  She reinforced this in her deposition testimony.  *Dannan Deposition* at 85:25-86:3 (affirming that food sales is the "total amount of food that [she] sold to customers on [her] shift").  Other Plaintiffs stated that they were required to give a percentage of food sales, but the percentages varied.  *See Exhibit AM* (Johnson (5%), Kocinski (5%), Narez (5-10%), and Robinson (10%)); *Losito Deposition* at 19:1-10 (10-15%).  Plaintiff Baum gave a percentage of her *total sales* to the cooks.  *See Exhibit AM.*  Plaintiff Baum was clear in her deposition testimony that she was taught by a training server that she was to share with cooks based on the "*total amount* of food and drink and anything else that [she] had sold[.]"  *Baum Deposition* at 27:8-16.  She gave 5-10% when she was a server, but 10-15% when she was a

bartender.  *Baum Deposition* at 46:2-10.  Plaintiff Wilson also stated that she was required to give cooks a percentage of her total sales.  *See Exhibit AM* ("5-10% of her sales").

Some Plaintiffs reported a hybrid policy of giving money to cooks based on sales and/or tips received.  Plaintiff Kirk stated that she was initially required to give 5% of her tips to cooks, but that this changed to 5% of her food sales.  *See Exhibit AM*.  Plaintiff Mazzio was unique in stating that she was required to give a "certain percentage" of her *food sales tips*, that is, the amount that she was tipped based on food sales.  *Id.*

The distinction between basing the amount given to cooks based on sales versus giving based on tips is significant.  As is widely known, a customer in a bar or restaurant will typically give a server or bartender a tip that is a percentage of the amount of her purchase.  If customers are giving, for instance, 20% tips on their purchases, then the amount of money that a server or bartender holds in tips is, at the end of a shift, approximately one-fifth of the amount of "total sales."  If customers tip less, the percentage of tips compared to total sales will be smaller.  In either case, if a server is required to give 10% of her total sales to cooks, she will give approximately five times as much to the cooks as her co-worker who was required to give 10% of her tips.  The server who gives 15% of her total sales to cooks will give 12 times the amount that another server who gives 5% of tips to the cooks gives.  These are not the same tip sharing policies and those two employees are not similarly situated.  Plaintiffs, as an example, produced server "Clock Out" receipts from one former employee.  *See Exhibit AN* (Plaintiffs' document stamped 0093 HOTSHOTS).  On September 24, 2010, the server reported "Sales" of $427.26. *Id.*  She reported receiving $82.64 in tips.  *Id.*  If she was required to give 10% of her total sales, she would have given over $42.00 to the cooks.  If she was required to give 10% of her tips, she would have given just over $8.00.  The distinction is even more pronounced for Plaintiffs like

16

Alicia Baum, who testified that she was required to give 5-10% of her total sales to the doorman, 5-10% to the bartender, and 5-10% to the cooks. *Baum Deposition* at 44:22-45:3. If she sold $427.26 in a shift, and gave 5% to each of those groups, she would have given out over $64.00. If she gave 10% to each, she would give over $128.00. That is a drastically different policy than other Plaintiffs, such as those who, as explained below, would give as little as $5.00.

Some Plaintiffs stated that they had to give a flat amount to the cooks, but the amounts varied from $5 to, again, four times that amount. *See Exhibit AM* (Banholzer ($5-10), Carroll ($10 weekdays, $20 weekends), Hancock ($10-20), Sutton ($5 to each cook), and Tiernan ($5-10). Named Plaintiff Carroll in particular stated that the policy to which she was subject required twice as much be given on the weekends. *Id.* The rest of the Plaintiffs "cannot recall" how much they were required to share with cooks. *See id.* (Cole, Cook, Gross, Khoury, McCarty, and Zahn).

### ii. There is no discernible uniform tip sharing policy based each Plaintiff's disparate policies.

The Plaintiffs' inconsistent answers do not appear to follow any pattern as to location or supervisor. Each Plaintiff identified the Hotshots location or locations where she worked. *Exhibit AM* at Interrogatory #4. The deposed Plaintiffs also testified to the locations where they worked. Those responses have been compiled in the table at Exhibit AO and compared with each Plaintiff's response concerning the policy to which they were subjected regarding giving money to cooks. The Exhibit shows that Plaintiffs have no evidence of a uniform policy across Hotshots. In fact, there was no evidence of a uniform unlawful policy at any single Hotshots location. Twenty-one Plaintiffs at the Fenton location stated that they were subject to twelve different policies. *Id.* Seven Plaintiffs at the Maryland Heights location alleged six different

policies. *Id.* Nine Plaintiffs at the Manchester location reported five different policies. *Id.* At no location did all Plaintiffs state the same policy. *See id.* At each location, at least four different policies were reported, including at the O'Fallon, Missouri location, where each Plaintiff stated she was subject to a different policy than the others. *Id.*

The inconsistencies remain when the policies with respect to cooks are broken down by supervising manager. Each Plaintiff identified the managers who "required me to participate in the unlawful tip pooling/sharing arrangement" in her Answers to Interrogatories. *See Exhibit AM*. The deposed Plaintiffs also identified managers. Those responses are compiled in the table at Exhibit AP. Nearly 30% of the managers who Defendants identified as having been managers at Hotshots locations during the Class Period were not named by any Plaintiff as having required any tip sharing. *Id.* Another eight of the 57 managers were identified only once. *Id.* Of the managers who were identified by more than one Plaintiff as having required them to participate in a tip sharing scheme, not a single manager was alleged to have subjected all Plaintiffs under his supervision to the same policy. *Id.*

There is no consistency between the Plaintiffs' claims. Just as in *Johnson*, Plaintiffs have admitted that there is "substantial variance of experiences by different Plaintiffs under different managers and at different shops[.]" *See* 2005 WL 1994286, at *2. Plaintiffs' simple allegation of one unlawful policy of tip sharing is not sufficient and not supported by Plaintiffs' own testimony. The allegedly unlawful policy must be "uniformly or systematically implemented at any given store." *Id.* Where "even within a given store, one manager in one department would react to the 'policy' differently than in another department," there is no uniform policy and Plaintiffs are not similarly situated. *Basco*, 2004 WL 1497709, at *8. Plaintiffs themselves have testified and demonstrated that there was not a uniform policy.

### c.   Hotshots managers, as well as other Hotshots servers, bartenders and cooks, have testified that they were not subject to a mandatory tip sharing policy.

In addition to Plaintiffs' own statements and testimony, many Hotshots managers, servers, bartenders and cooks have signed statements reiterating that there is no policy at Hotshots requiring servers and bartenders to share any amount of money with any other employee.  Former servers and bartenders Katie Fisele, Sara Klopstein, Kadi Labreyere, Nikki Payne, Amanda Reynolds, Dawn Sherrill, and Cassie Solita, as well as current servers and bartenders Stephanie Martorelli, Danielle Naes, Jessica Page, Annie Steiner, and Deanna Witte, all stated in their Affidavits that there was no such requirement, and that they were not required to give any money to another employee.  *See Exhibits C* through *AE* (Affidavits in alphabetical order by last name).  The money that they gave to other employees, if any, was completely voluntary.  *Id.*  Some servers and bartenders stated that they did not give money to other employees every time they worked.  *Id.*  Current and former cooks, who Plaintiffs have alleged were given money each and every time they worked, stated that they were not given tips every time they worked.  *See Affidavits* (Campbell at ¶11, Friedhoff at ¶9 (two month period with no tip from a server or bartender), Hastings at ¶6 and Lloyd at ¶9-14, Lopez at ¶9).

Managers also testified that they do not require servers and bartenders to give tips to other employees, and that there is no Hotshots policy requiring as much.  *Affidavits* (Campbell, Currie, Groeper, Hahs, Halverson, Hastings, Kaba, Lloyd, Lopez, McConnell, Mott, Paladino).  The affiants – servers, bartenders, cooks, kitchen managers, assistant managers and managers – stated that there was never any discipline or punishment for servers or bartenders who did not give money to other employees.  *See all Affidavits* (including Halverson at ¶13 (witnessed servers telling cooks that they would not be giving the cooks any money and imposed no

discipline)).  Managers have, however, disciplined cooks who solicited tips from servers or

bartenders.  *See Mott Affidavit* at ¶16 (stating that he disciplined a cook for soliciting tips from

servers).

Evidence from these other employees is critical in that it shows that there was no

company-wide Hotshots policy requiring servers and bartenders to participate in a tip pool.

Here, managers and employees, including servers and bartenders, have stated that there was no

such requirement.  Cooks regularly did not receive money from servers or bartenders.  Trial of

the collective action will require individualized inquiries into the implementation of the policy

and practice at each store, as it applied to each manager and employee.  The collective

certification procedure is constructed specifically to exclude certification in instances like this,

where the Plaintiffs are not similarly situated and there is no uniform policy to which the

employees were subject.

### d.  Plaintiffs cannot satisfy their burden to show a specific, uniform, company-wide policy.

The disparate testimony and evidence from the Plaintiffs – different managers, different

stores, different percentages, different shift requirements, different policies – cannot satisfy their

burden for collective certification.  A plaintiff seeking collective certification must establish with

detailed factual support that she and other potential plaintiffs "together were victims of a

common policy or plan that violated the law." *Morano v. Intercontinental Capital Group, Inc.*,

2012 WL 2952893, at *5 (S.D.N.Y. July 17, 2012) (granting motion to decertify).  "Where there

is no evidence of a company-wide policy, company-wide certification is inappropriate." *Wacker*,

2008 WL 4838146, at *4 (E.D.Mo. Nov. 6, 2008) (denying motion for conditional certification).

"Where an employer maintains a formal policy of lawful compensation, plaintiffs must present

20

substantial evidence that the employer, in fact, shirked its FLSA responsibilities." *Martin*, 2013 WL 1234081, at *3 (E.D.Pa. March 27, 2013).  The plaintiffs must be subjected to the same, specific unlawful plan.  *Id*.  "General allegations of an overarching employer policy are insufficient, and plaintiffs are required to produce substantial evidence of a single decision, policy, or plan."  *Id.; Thompson v. Speedway Superamerica, LLC*, 2009 WL 130069, *2-3 (D. Minn. Jan. 20, 2009) (denying motion for conditional certification where there was "no evidence that [defendant] has made a corporate decision not to comply with its own policy").

Decertification is appropriate where there are variations in the ways that individual employees allege being impacted by the employer's policies and practices.  In *Martin*, the Court granted the defendants' motion to decertify the collective action because, while the plaintiffs alleged a single, companywide policy of not paying for overtime, an analysis of the facts showed that there was no such company policy.  2013 WL 1234081 (E.D.Pa. March 27, 2013).  The Court relied on authority from *Lugo v. Farmer's Pride, Inc.*, 737 F. Supp. 2d 291, 303 (E.D.Pa. 2010), in which the Court held that any "undercompensation was not suffered on a collective basis – i.e., according to a single decision, policy or plan applicable to all plaintiffs – but rather that defendant's policies and practices **impacted individual plaintiffs in individual ways**." *Martin*, 2013 WL 1234081, at *5 (E.D.Pa. March 27, 2013) (quoting *Lugo*, 737 F. Supp. 2d at 303) (emphasis added).  In *Martin*, the deposed plaintiffs testified that they could "only speak to their own experiences and not the Plaintiffs as a whole."  *Id*.  Although the plaintiffs "generally assert[ed] that they were subject to the same practice or policy: [defendants'] failure to pay overtime for off-the-clock work," the Court found many differences in the plaintiffs' stories of allegedly unlawful behavior.  *Id*. at *5-6.[1]  "Even if Plaintiffs' allegations are accepted as true,

---

[1] FLSA cases involving aspects of the statute other than tip sharing (e.g., overtime pay) are still relevant when discussing the standards for certification and are relied on by district courts for that purpose.  *See, e.g.*, *Trinidad v.*

Defendants' policies do not appear to be a 'single decision, policy, or plan,' but rather policies and practices that 'impacted individual plaintiffs in individual ways.'" *Id.* at *6 (quoting *Lugo*, 737 F. Supp. 2d at 303.

Differences in the amount of compensation that employees lost by way of the alleged policy or practice also show that the employees are not similarly situated.  The Court in *Castle v. Wells Fargo Financial, Inc.*, 2008 WL 495705 (N.D.Cal. Feb. 20, 2008), found that variances in the amount of unpaid overtime that employees were required to work precluded certification. The Court found that the employees had "not identified any company-wide policy or practice to deny overtime and thus have failed to show that the various . . .  employees are similarly situated for purposes of class certification." *Id.* at *5.  The employees' declarations described "differing 'company policies.'" *Id.*  One employee was limited to five overtime hours, another was limited to two hours, another limited to one, and another told that no overtime would be paid.  *Id.*  "At the most, plaintiffs' evidence suggests differing 'policies' or practices depending on the branch or the district, rather than on a nationwide basis." *Id.*  "The variety of different circumstances under which the declarants were allegedly required to work unpaid overtime also weighs against certification." *Id.*  For instance, some employees allegedly were not paid to perform a certain task, while other employees were not paid to perform a different task.  *Id.*  "Resolution of plaintiffs' claims would require individualized determinations, and would necessitate testimony from individual employees and their supervisors[.]" *Id.* (denying conditional certification).

### e.  Plaintiffs have made no complaints beyond their immediate supervisors.

A lack of substantial evidence of complaints made to supervisors for unlawful behavior also precludes certification of a collective class.  In *Pacheco v. Boars' Head Provisions Co., Inc.*,

---

*Pret A Manger (USA) Ltd.*, 2013 WL 3490815, at *4-5 (S.D.N.Y. July 11, 2013) (relying on cases alleging violations such as improper pay deductions).

671 F. Supp. 2d 957 (W.D.Mich. 2009), the defendant had a lawful written policy concerning

overtime.  On a motion for collective class certification, the Court found

> no evidence that supervisors were simultaneously trained, advised, or encouraged
> **not** to follow the written policy.  Nor is there <u>any evidence that management was
> aware that the written policy was being violated by some supervisors</u>.  If, as
> Plaintiffs, assert, [the defendant] has a uniform [unlawful practice] after assuring
> the production employees in written corporate policies that they would be paid for
> such activities, the Court would expect to see evidence that complaints were made
> to management about this practice.  There is simply <u>no evidence in this case that a
> single complaint of a violation of the written policy was ever made to anyone
> outside of the employee's particular department</u>.

*Id.* at 963 (bold emphasis in original, underlined emphases added).  One plaintiff testified that he

reported pay discrepancies to his supervisor; the other plaintiffs testified that they never

complained.  *Id.*  Based in part on the lack of evidence of complaints, the Court denied the

motion to certify.  *Id.*

Plaintiffs have admitted that they did not make complaints beyond their immediate

supervisors.  *Baum Deposition* at 56:16-57:18 (complaints by a few employees made to

"managers on duty"); *White Deposition* at 99:20-23 ("Q. When you were working at HotShots,

did you ever make a complaint to anyone about the tip pooling policy?  A. No."); *Dannan

Deposition* at 98:12-21 (Plaintiff only knows of one complaint she made to an immediate

supervisor); *Losito Deposition* at 54:6-17 (Plaintiff only knows of one complaint she made to an

immediate supervisor).  Dan and Julie Volmert also testified that they had received no

complaints about tip pooling and knew of no such complaints.  *Dan Volmert Deposition* at

102:12-103:2, relevant portions of which are attached hereto as Exhibit AP; *Julie Volmert

Deposition* at 220:7-18.  There is no evidence of complaints outside of the Plaintiffs' and other

servers' and bartenders' immediate supervisors.

V.     **Defendants' individualized defenses against each Plaintiff's claims preclude collective certification.**

In additional to the individualized proof and defense issues set out above, collective certification is not appropriate because Defendants will be entitled to individualized inquiry of the Plaintiffs' credibility, several of whom have already proven not credible.  "Individualized defenses prevent efficient representative proceedings and courts have not hesitated to grant decertification on that basis.  The court may exercise its discretion to determine whether individual defenses make a collective action unmanageable." *Kuznyetsoz v. West Penn Allegheny Health Sys., Inc.*, 2011 WL 6372852 (W.D.Pa. Dec. 20, 2011) (denying motion to certify and granting motion to decertify).  The Named Plaintiffs lied repeatedly in their Declarations upon which their Motion for Conditional Class Certification was filed, including facts specifically about whether they were similarly situated to other employees.  Despite making written declarations that they knew that employees at all Hotshots restaurants were subject to the same tip sharing policy as them, they both testified in their depositions that they did not know what, if any, tip sharing policies were implemented at other locations, on other employees at their own locations, or even upon each other.  Other employees also admitted that they were not truthful.  A primary issue in this case will be whether Hotshots employees were subject to a tip sharing policy, and their credibility on the different policies to which they and their co-workers were allegedly subject will require individualized inquiries of each Plaintiff simply because the Plaintiffs who were deposed showed through their testimony that they were not credible.

### a. Testimony that is not credible, and is contradictory, is not appropriate for collective certification.

The collective class also should not be certified because individualized inquiry of their credibility is required.  Contradictory testimony and the credibility of individual plaintiffs are considered in the second stage of the collective class certification process.  *Martin*, 2013 WL 1234081, at *6 (E.D.Pa. March 27, 2013).  In *Martin*, seventeen managers were named by plaintiffs as having withheld overtime payments.  *Id.*  Those managers provided declarations that they had accurately paid overtime.  *Id.*  "In order to resolve the question of liability, a fact-finder would need to determine whether the employee or the manager was being truthful.  However, Defendants correctly note that resolving this question with regard to one manager and one employee would not accomplish the task for any of the others."  *Id.*  Further, the defendants pointed to many contradictory statements made in the plaintiffs' declarations and depositions, as well as "those who have other, more substantial credibility issues."  *Id.*  The Court found that cross-examining one plaintiff's credibility "would not help the fact-finder assess the credibility of any other Plaintiff," and that "[t]hese individualized defenses destroy the efficiency sought to be gained through a collective action."  *Id.* at *7.  The Court found that the plaintiffs therefore were "not similarly situated with regard to possible defenses."  *Id.*; *see also Lugo*, 737 F. Supp. 2d at 316 ("[T]he inconsistencies in the testimony offered by other plaintiffs – as to this topic and in general – undermine their credibility and value as common evidence of the experiences of the putative class members.").

Likewise, in *Pacheco*, the Court found that "[b]ecause there is a company policy in place that complies with the FLSA requirements . . ., the Plaintiffs' allegations of [an unlawful practice] rest peculiarly on Plaintiffs' credibility."  671 F. Supp. 2d at 964.  The Court considered

inconsistencies between the plaintiffs' affidavits and deposition testimony, as well as disciplinary actions taken by the employer, in determining that the plaintiffs were not similarly situated.  *Id.* at 964-65 ("[T]he sweeping statements in [plaintiff's] affidavit were similarly contradicted by his deposition testimony.").  "The Court is concerned about the contradictions between Plaintiffs' affidavits and their deposition testimony, because they show the importance of cross-examination of each plaintiff and suggest the need for separate mini-trials to resolve each individual's claim." *Id.* at 965 (citations omitted).  "Such a result is the antithesis of collective action treatment and would overwhelm the judicial system and eliminate any judicial efficiency that might be gained through a collective approach." *Id.* (same).

      **b.  The Named Plaintiffs made several contradictory statements in their written statements and deposition testimony.**

      The Named Plaintiffs lied repeatedly in their Declarations submitted in support of their Motion for Conditional Class Certification, and the lies were specifically about whether they were similarly situated to other Hotshots employees and subject to a uniform unlawful policy. Named Plaintiff Thelma White stated in her Declaration, under penalty of perjury, that "I know that HotShots tip pooling policy applies uniformly to all of the HotShots locations." *See Doc. #44-2* at ¶14.  During her deposition, White testified that she worked at the Manchester, Downtown, Fenton, O'Fallon (Illinois) and Bridgeton locations.  *White Deposition* at 39:14-19. In direct contradiction of her Declaration, she testified that she does not know the tipping policy at the other Hotshots restaurants, where she did not work.  *White Deposition* at 52:6-10 ("Q. You don't know what the tipping policy is at the other HotShots locations that are not Manchester, downtown, O'Fallon, Illinois, Fenton, or Bridgeton?  A. No, I do not.").  Named Plaintiff Carroll made the same statement in her Declaration.  *See Doc. #44-3* at ¶15 ("I know that HotShots' tip

pooling policy applies uniformly to all of the HotShots locations."). During her deposition, Carroll testified that she worked at the Bridgeton, Manchester, Fenton and Downtown Hotshots locations. *Carroll Deposition* at 20:13-17. Carroll also testified, in direct contradiction to her Declaration, that she does not know whether employees at locations where she did not work were required to participate in tip pooling. *Carroll Deposition* at 174:10-13 ("Q. And do you know whether at the locations you did not work they were required to tip the cooks or doormen at all? A. I don't know. I didn't work there."). Plaintiffs presented the false statements in the Declarations as the only testimony supporting their Motion to Conditionally Certify the Conditional Class. *See Doc. #68* at p.7-8 ("While the Court acknowledges that distinctions exist among the Hotshot's teams and locations, Plaintiffs' affidavits provide enough evidence at this stage to demonstrate employees were similarly situated and subject to a common practice.").

Named Plaintiff White, in fact, testified that she didn't even know whether other servers and bartenders at the restaurants where she worked, *including Named Plaintiff Carroll*, were subject to the same policy as she was. *White Deposition* at 96:18-97:3 ("I'm not Nicole. I'm Thelma. I'm – I'm only answering my – for me. I cannot answer for somebody else."); 191:3-13 (asked about another employee's record of sharing a tip: "I have no idea, though. I'm not Ashley. I'm Thelma. I don't know."). Ms. Carroll also testified that she didn't know whether other employees at the same Hotshots locations where she worked were subject to the same policy to which she testified she was subject. *Carroll Deposition* at 170:3-9 ("Q. But you don't know whether that was how it was enforced as to other employees even at the locations where you worked? [Objection.] A. No, I don't.").

The Named Plaintiffs' testimony about the Hotshots tip sharing policy contradicted their prior affidavits in many other ways. Thelma White stated in her Declaration that she was

27

"required to pay – and did pay – the door guy at least $5 per shift.  Every server was required to

pay the door guy that same minimum amount."  *Doc. #44-2* at ¶15.  She also stated that she "was

required to pay – and did pay – at least five percent (5%) of all of [her] tips to

cooks/dishwashers."  *Id.* at ¶16.  She said the same in her Answers to Interrogatories.  *See White*

*Answers to Interrogatories* at #6.  During her deposition, she testified that, if a kitchen manager

was the only cook on duty in the kitchen, she did not have to tip any money to a cook.  *White*

*Deposition* at 130:16-21 ("If he's the only one in the kitchen, you work during the day, you don't

have to tip him out, as well, because he's a paid manager[.]"); 208:20-25 ("A. The day shifts that

I worked that Sue worked the bar and that Greg worked the kitchen and there's never a door guy

during the day, I did not tip out.  If no doorman was working, there would be no tip to the

doorman."); 195:2-3 ("Sue works seven days a week almost and Greg worked almost seven days

a week, too.").  There were shifts when she tipped no one.  *Id.* at 195:4-19.  This testimony is

directly contradictory to her Declarations (upon which conditional certification was sought and

granted) that she and all other servers and bartenders gave tips to the doorman and cook every

shift.

        Named Plaintiff Thelma White also lied about the accuracy and utility of the so-called

Tip Logs, and this testimony cripples certification because the parties will need to present

individualized evidence on the possibility of having shared tips at all.  The Declarations,

testimony and documents contradict one another.  In *Briggins*, two of fifty deposed plaintiffs

were found to have contradicted their timesheets, calling into question whether they were

actually required to work off the clock.  882 F. Supp. 2d at 1275.  The Court found: "That the

defendants would have to question and impeach individual plaintiffs, because no representative

testimony exists as to the extent of a plaintiff's unpaid overtime, is a point the court must

28

consider in deciding whether the plaintiffs are similarly situated and whether a collective action is proper in this case." *Id.* at 1276.  Similarly, Plaintiffs' claims here are refuted by the documents.

The Named Plaintiffs both stated in their Declarations that Hotshots kept a Tip Log that "indicated how the tips of a server or bartender were split among other employees[.]" *Doc. #44-2* at ¶17; *Doc. #44-3* at ¶18.  The Named Plaintiffs also stated "[a]s required by Hotshots, the log was signed or initialed each shift by each server/bartender, and the log indicates the amount of a server's or bartender's tips that were shared (as required) with other employees." *Id.*  They both initially affirmed this testimony in their depositions. *White Deposition* at 89:25-90:3 ("Q. And the managers made sure that the Tip Log was accurate and filled out by each employee every shift?  A. Yes."); 132:2-4 ("Q. But at locations where there was a Tip Log, you filled out the Tip Log each shift?  A. Correct."); *Carroll Deposition* at 163:5-11.  Defendants produced documents that the Named Plaintiffs identified as the Tip Logs from the Manchester location between January 2, 2012, and March 22, 2012. *Carroll Deposition* at 159:18-160:17 (identifying Tip Logs); *Exhibit AR* (Deposition Exhibit 15).  Defendants have also produced documents ("Labor Reports") that Plaintiffs have stipulated show the days that each employee worked. *Doc. #131 (Stipulation)*; *Exhibit AS* (Deposition Exhibit 19, Labor Reports redacted of all employees except Named Plaintiffs).  By comparing the Tip Logs and Labor Reports from the Manchester location from January to March 2012, one can evaluate whether servers and bartenders tipped any amount at all, regardless of whether it was required – and the documents showed that employees did not do so.

For example, Named Plaintiff White testified, and the Labor Report showed, that she worked on January 9, 2012, but there was no record on the Tip Log of her (or any other

employee) giving a tip to anyone that day. *White Deposition* at 177:4-15. She also testified that she worked on January 14, 2012. *Id.* at 177:21-22. The Tip Logs show that, while some servers or bartenders gave tips to other employees that day, there is no record of Ms. White giving a tip to anyone that day. *Id.* at 179:3-6. The Tip Logs also showed that Ms. White gave no tips to anyone when she worked on January 28, 2012. *Id.* at 194:10-195:19. She justified this by explaining, in contradiction to her Declaration, that she was not required to give a tip to a cook or doorman every time she worked. *Id.* She worked on February 6th and February 9th, but the Tip Logs do not show any tips given by her to any employee. *Id.* at 202:5-19. On one page of the Tip Log, the Log specifically states that another employee gave $0 to any employee. *Id.* at 206:10-207:9. Likewise, the Tip Log shows that on January 27, 2012, Ms. White gave "$0" to the cooks, and the space for the doorman is blank. *Id.* at 207:15-208:5. Named Plaintiff Carroll also worked on January 9, 2012, but the Tip Log shows no tips given by her. *Carroll Deposition* at 160:21-161:11. She also worked January 14, 2012, but the Tip Log does not indicate that she gave tips to anyone else. *Id.* at 161:12-162:2. There were four instances from January 9, 2012, to February 6, 2012, where the Tip Logs do not indicate that Ms. Carroll gave a tip to anyone. *Id.* at 185:18-186:8.

As the inconsistencies between their Declarations and the documents were pointed out, the Named Plaintiffs changed their testimony. Thelma White first stated that her Declaration statement (made under penalty of perjury) that "the log was signed or initialed each shift by each server/bartender" was correct "because we were required to tip out and that's what – that's what we did, was tip out. Whether or not we wrote it down and kept record of every single day, that was the manager's job[.]" *White Deposition* at 181:7-15. This, of course, is directly contrary to her testimony that <u>she and every server/bartender</u> filled out the Tip Log "each shift." *Id.* at

30

132:2-4.  She later testified that, with regard to tipping the doormen, "I and a few other girls just personally handed the door guys their money, so we never kept – most of us never even wrote it on here."  *Id.* at 184:23-185:1.  Ms. Carroll likewise contradicted her Declaration statement, testifying that there were at least four times in less than a month that she did not record tips distributed on the Tip Log.  *Carroll Deposition* at 185:18-186:13 (testifying that she had not recorded her tips four times in a month, despite earlier testifying that she had only failed to give out tips two or three times during the entire period she was employed at Hotshots).

These contradictory statements call into question whether Hotshots servers and bartenders really were under a uniform policy requiring them to unlawfully share tips.  Named Plaintiffs stated unequivocally in their Declarations that they were required to write down the tips, and that the Tip Logs accurately reflected the amount of tips shared each shift.  The Tip Logs do not show tips shared by each employee every shift, and they show shifts where no money was shared.  The Named Plaintiffs then testified that they, in fact, did not write in the Tip Logs every shift and that they and others were not actually required to do that.  Just as in *Briggins*, these contradictions raise individualized defenses: are the Tip Logs accurate or not?  Did individual employees really have to share their tips?  If they did have to share their tips, why do the Tip Logs so often show no such sharing occurred?

### c.  Several Plaintiffs are generally not credible.

There are larger credibility issues with some Plaintiffs.  The larger credibility issues compel decertification because trial on the Plaintiffs' claims will require impeachment of each and every opt-in Plaintiff.  *See, e.g.*, *Martin*, 2013 WL 1234081, at *6 (stating that Plaintiffs with "other, more substantial credibility issues" contribute to denying certification); *Lugo*, 737 F. Supp. 2d at 316 ("[T]he inconsistencies in the testimony offered by other plaintiffs – **as to this**

**topic and in general** – undermine their credibility and value as common evidence of the experiences of the putative class members.") (emphasis added).  Named Plaintiff Carroll initially testified that she always reported all of her tips to Hotshots.  *Carroll Deposition* at 157:1-3 ("Q. Are there times when you made more in cash tips than you reported to HotShots?  A. No.").  She then changed that testimony, stating that she had made more in tips than she had reported.  *Id.* at 157:17-21.  She claimed to have been confused by the initial question.  *Id.* at 157:25-158:3.  She did not report the additional money earned to any taxing authority.  *Id.* at 158:4-9.  She admitted lying on her tax returns about the amount of tips that she earned working at Hotshots.  *Id.* at 158:10-13 ("Q. So, you lied on your tax return when you did not report that additional cash that you took home?  A. Yes.").  She admitted that, when she reported her tips earned each shift to the Hotshots computer system (the same system that creates the Labor Reports), she would round up her tips earned to the nearest dollar above the amount of credit card tips that are automatically entered into the system.  *Id.* at 158:14-18. Named Plaintiff Carroll lied about a fundamental issue in this case – how much money did she earn in tips?  What did she do with the money she earned in tips?  How much money did she walk away with each night at Hotshots?

Plaintiff Baum likewise admitted rounding her reported tips to the nearest dollar or Five-Dollar mark.  *Baum Deposition* at 81:25-83:7.  Plaintiff Losito's reported tips were also frequently on an even Five-Dollar mark.  *Losito Deposition* at 89:19-90:3.  Plaintiff Dannan admitted that she lied on her employment application to Hotshots about her arrest history.  *Dannan Deposition* at 7:11-8:2 (stating that she was arrested over seven years ago); 24:8-17 (reviewing employment application wherein she was asked if she had "ever been arrested for, or convicted of a crime other than a routine traffic violation": "Q. And you said no.  Was that true?  A. No."); 143:13-16 ("Q. Do you agree, did you lie on that application? [Objection.]  A. Sure").

Plaintiff Dannan also admitted during her deposition that she was fired from Hotshots. *Id.* at 132:22-24.  She stated that she was fired because multiple people at a table would want to use their reward cards for a group purchase, but "you could only swipe one [rewards] card per check," so she would "take each person's card and [she] would swipe it once for other tables in the restaurant . . . [s]o that they would each get some points on their cards[.]"  *Id.* at 132:25-134:4.  This was not why she was fired.  Receipts from her shifts showed that she was using the same person's card for multiple purchases throughout the evening.  *Id.* at 134:8-136:9; Exhibit AT (Deposition Exhibit AS) (redacted of employee and customer personal information).  Her Separation Report states that she was confronted over this theft and misuse of the rewards cards. *Exhibit AU* at HOTSHOTS11298.  Ms. Dannan admitted that she understood this to be theft and that she admitted to the charges against her.  *Dannan Deposition* at 141:24-142:7.  Despite this, she still did not initially state in her deposition the real reason that she was fired.  *See id.* at 132:25-134:4.

Plaintiffs' claims are not eligible for collective certification because of the varied defenses that Defendants will have to present.  In addition to examining the disparate policy claims of each and every Plaintiff, the veracity of each Plaintiff is under question.  The only Plaintiffs who stated that Hotshots had a uniform tip sharing policy – Named Plaintiffs Carroll and White – recanted those statements during their deposition testimony.  Other Plaintiffs admitted to lies or contradicted themselves during deposition testimony about their employment and whether they were required to share tips with other employees.  Collective certification is not appropriate.

**VI.      Fairness and procedural concerns compel decertification of the collective class.**

The individualized inquiries required of this case, as set forth above, demonstrate that collective certification is not appropriate.  The third and final factor in determining whether decertification is appropriate is weighing the fairness and procedural concerns.  *Lugo*, 737 F. Supp. 2d at 301.

> The court should consider that the primary objectives of a § 216(b) collective actions are: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity.  The court must also determine whether it can coherently manage the class in a manner that will not prejudice any party.

*Id.*  The Court cannot efficiently resolve Plaintiffs' claims as a collective action because the facts are wildly disparate.  As set forth above, Plaintiffs have presented dozens of different tip sharing policies to which they were allegedly subject.  All Plaintiffs will have to be individually scrutinized about their individual policies, when and where they were subject to those policies, how often they were subject to those policies, by which managers, the differences between policies at locations where they worked, and whether those policies were the same as anyone else.

Additionally, Named Plaintiffs, who purport to act on behalf of all Plaintiffs, have already proven untrustworthy through their Declarations and deposition testimony.  Representative testimony through them is not possible, as they have admitted – contradicting their written statements – that they do not know if other employees were subject to the same policies to which they were subject.  The other Plaintiffs who were deposed also were not credible on issues concerning their compensation and their propensity for truthfulness.

The Court cannot coherently manage a class that has made so many different policy allegations.  Allowing Plaintiffs to litigate by representative testimony will prejudice Defendants

because of the disparate facts stated by Plaintiffs.  Defendants will be unable to properly address and rebut the varied testimony and statements.  The servers and bartenders worked for dozens of managers.  They worked at several different locations.  Although most have testified that they were subject to the same policy no matter where they went or who supervised them, they are contradicted by Plaintiffs at those same locations and working for those same managers who stated that they were subject to different policies.  Deposed employees have admitted that they were not required to share tips on all of their shifts.

Collective certification is not appropriate where, in the interests of fairness and procedural efficiency, the case cannot be tried collectively.  The prejudice to Defendants will be great if Plaintiffs are collectively certified and tried together.

## VII.   Conclusion

Plaintiffs' conditional collective class should be decertified.  Plaintiffs have not shown that they are similarly situated by being subject to a single uniform unlawful policy, which is their burden for certification.  General allegations of unlawful practices are insufficient and the collective action plaintiffs cannot have been impacted in different ways.  Plaintiffs' own statements and testimony, from the Named Plaintiffs through each of the other opt-in Plaintiffs, do not show any uniformity.  Plaintiffs testified to being subject to dozens of different policies, with no regard for store location or supervising manager.  Further, Plaintiffs' conditional certification was built upon Named Plaintiffs' statements of uniformity that they later recanted and admitted were not true.  Collective certification is inappropriate because these factual disparities, and the individualized defenses that they compel, will lead to procedurally untenable simultaneous litigation and trial of all the claims.  Defendants' Motion to Decertify the Collective Class should be granted.

**BLITZ, BARDGETT & DEUTSCH, L.C.**


By:     /s/ Christopher O. Bauman
           Christopher O. Bauman, #52480MO
           Jason K. Turk, #58606MO
           120 South Central Ave., Ste. 1650
           St. Louis, MO  63105
           Telephone: (314) 863-1500
           Facsimile: (314) 863-1877
           cbauman@bbdlc.com
           jturk@bbdlc.com
           *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

A copy of the forgoing document was served via the Court's ECF system the 16th day of September, 2013, upon the following:

Russell C. Riggan
2000 South 8th St.
St. Louis, MO 63104
Phone: (314) 771-5555
Fax: (314) 735-1054
russ@rigganlawfirm.com
*Attorney for Plaintiffs*

Cyrus Dashtaki
5201 Hampton Ave.
St. Louis, MO 63109
Phone: (314) 832-9600
Fax: (314) 353-0181
cyrus@dashtaki.com
*Attorney for Plaintiffs*

                                       /s/ Christopher O. Bauman